# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Wagstaff Minnesota, Inc., | Case No. 11-43073 |
| Debtor. | Chapter 11 Case |
| Wagstaff Properties, LLC, | Case No. 11-43074 |
| Debtor. | Chapter 11 Case |
| Wagstaff Management Corporation, | Case No. 11-43081 |
| Debtor. | Chapter 11 Case |
| Wagstaff Properties Minnesota, LLC, | Case No. 11-43076 |
| Debtor. | Chapter 11 Case |
| D & D Food Management, Inc., | Case No. 11-43084 |
| Debtor. | Chapter 11 Case |
| D & D Idaho Food, Inc., | Case No. 11-43083 |
| Debtor. | Chapter 11 Case |
| D & D Property Investments, LLC, | Case No. 11-43075 |
| Debtor. | Chapter 11 Case |
| Wagstaff Texas, Inc., | Case No. 11-43080 |
| Debtor. | Chapter 11 Case |
| Wagstaff Properties Texas, LLC, | Case No. 11-43077 |
| Debtor. | Chapter 11 Case |
| Wagstaff Atte Alaska, Inc., | Case No. 11-43082 |
| Debtor. | Chapter 11 Case |
| Wagstaff Atte Alaska, LLC, | Case No. 11-43078 |
| Debtor. | Chapter 11 Case |
| A D Bakes, Inc., | Case No. 11-43079 |
| Debtor. | Chapter 11 Case |

**NOTICE OF HEARING AND JOINT VERIFIED MOTION FOR (I) EXPEDITED
RELIEF AND (II) INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS'
USE OF UNENCUMBERED CASH OR CASH COLLATERAL AND (B) GRANTING
ADEQUATE PROTECTION**

TO:   The parties in interest as specified in Local Rule 9013-3(a)(2):

1.   Wagstaff Minnesota, Inc. ("Wagstaff") and the other debtors named above (collectively, the "Debtors"), by and through their legal counsel, respectfully move the Court for the relief requested below and give notice of hearing.

2.   The Court will hold a hearing on the request for interim relief (the "Motion") at **9:00 a.m. on Thursday, May 5, 2011**, in **Courtroom No. 8 West**, United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota.  The Court will hold a hearing on the request for final relief at **10:30 a.m. on May 18, 2011**, in **Courtroom No. 7 West**, United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota.

3.   Local Rule 9006-1(b) provides deadlines for responses to this Motion. However, given the expedited nature of the relief sought with respect to the portion of the Motion seeking an **interim order**, the Debtors do not object to written responses being served and filed immediately prior to the hearing.  Any response to the Motion for a **final order** must be filed and served so that it is received by the Debtors' counsel not later than five (5) days before the time set for the hearing (including Saturdays, Sundays, and holidays).  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING**.

4.   This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005, and Local Rule 1070-1.  This is a core proceeding.  The petitions

commencing the Debtors' chapter 11 cases were filed on April 30, 2011 (the "Petition Date"). The cases are now pending before this Court.

5.      This Motion arises under 11 U.S.C. §§ 105, 361, 363(c)(2) and 363(e), and Fed. R. Bankr. P. 4001(b).  This Motion is filed under Fed. R. Bankr. P. 9014 and Local Rules 9013 and 4001-2.

6.      The Debtors request an order authorizing the Debtors to use their unencumbered cash in which General Electric Capital Franchise Finance ("GEC"), and Perella Weinberg Partners Asset Based Value Master Fund I L.P. and Perella Weinberg Partners ABV Opportunity Master Fund II A L.P. (serviced by NFA Funding II, LLC) (together with its affiliates, "NFA"), (NFA and GEC, collectively, the "Secured Creditors"), each may claim an interest.  The Debtors are in the fast food restaurant business and the cash generated by the operation of the Debtors' businesses may constitute cash collateral of the Debtors' Secured Creditors.  The Debtors request an interim order authorizing the Debtors to use their cash on an interim basis from the date of the interim hearing through the date of a final hearing, and a final order authorizing use of cash collateral as follows: (a) through and including the period covered by the budget attached to the Motion as Exhibit A (the "Budget"); (b) through and including the term of any subsequent budget that is filed and served not less than 21 days prior to the expiration of the terms of the Budget; (c) if an objection is filed to that budget proposed in accordance with clause (b), the Debtors shall schedule a hearing on that proposed budget, in which case, the use of cash collateral shall continue for the term authorized by the Court; (d) this process may continue through and including April 30, 2012.

### RULE 4001 STATEMENT

7.      Pursuant to Fed. R. Bankr. P. 4001(b), the Debtors request an order authorizing continued use of their cash in which the Secured Creditors identified in paragraph 6 above claim

or may claim to hold an interest.  The Debtors will use the cash to continue their operations and preserve the going-concern value of their assets.

8.    The Debtors request interim authorization to use only the amount of cash that is necessary to avoid immediate and irreparable harm to their bankruptcy estates during the first four weeks of their cases pending a final hearing in the aggregate amount of $5.3 million, as indicated on the budgets attached hereto as **Exhibit A**, without material deviation, through June 3, 2011 or the date of the final hearing on Debtors' use of cash collateral, and final relief through April 30, 2012, subject to the procedure set forth above.

9.    If the relief is granted, the Debtors would be authorized to make the expenditures provided for in each budget weekly, and if necessary, to exceed the amounts set forth in each respective budget by as much as 15% of the total budget.  Any expenditures in excess of this authorization will require a further order of the Court after appropriate notice.  Budget savings for the Debtors in any week would be carried over and used by the Debtors in subsequent weeks (*i.e.*, to account for changes in the timing of expenditures by the respective Debtors).  After the expiration of the term of the Budget, the Debtors would be able to obtain use of any cash collateral under the procedures as follows: (a) through and including the period covered by the Budget attached to the Motion; (b) through and including the term of any subsequent budget that is filed and served not less than 21 days prior to the expiration of the terms of the Budget; (c) if an objection is filed to that budget proposed in accordance with clause (b), the Debtors shall schedule a hearing on that proposed budget, in which case, the use of cash collateral shall continue for the term authorized by the Court; (d) this process may continue through and including April 30, 2012.

10.    As adequate protection for any diminution in the Secured Creditors collateral arising from the Debtors use, the Debtors propose to: (a) grant Secured Creditors replacement liens in each of the respective Debtors' post-petition cash, accounts, equipment, inventory and the proceeds of the foregoing to the extent of the Debtors' utilization thereof; provided, however, that any and all such replacement liens would be of the same nature, character, validity, priority, dignity, extent and effect as the prepetition liens of Secured Creditors, if any, in such collateral prior to the Petition Date and shall be without prejudice to the rights of the Debtors or any other party in interest to challenge the nature, character, validity, priority, dignity, extent and effect of any such liens or commence any proceeding under the Bankruptcy Code seeking a determination with respect thereto or seeking to avoid or set aside any such liens; and further provided that such replacement liens would specifically exclude avoidance actions under chapter 5 of the Bankruptcy Code and the proceeds thereof (collectively, the "Replacement Liens"); and (b) provide Secured Creditors copies of such financial or operating reports as filed with the Office of the U.S. Trustee.  The Debtors would not waive any right to contest the rights of the Secured Creditors to receive adequate protection.  In addition, any liens granted or cash to be paid to the Secured Parties would be limited to actual and demonstrated diminution in the value of such Secured Creditor's collateral.

## BACKGROUND

11.    On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  The Debtors have continued in possession of their property and are managing their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.    The Debtors are corporations and limited liability companies that are owned in whole or in part by Denman Wagstaff and his wife, along with various other minority or equal

owners.[1]  Pursuant to franchise agreements, the Debtor corporations currently own and operate 77 "Kentucky Fried Chicken" restaurants in Alaska, California, Idaho, Minnesota and Texas, with a corporate headquarters in Hanford, California ("Operating Debtors").  The Debtors that are limited liability companies ("Property Debtors") each own real property that is leased to certain of the Operating Debtors.

13.     The Debtors currently have over 1,200 employees.

14.     A summary of the Debtors' assets and liabilities, and the events leading to the filing of the Cases, is set forth more fully in the separately filed Declaration of Denman Wagstaff In Support Of First Day Motions.   In summary, similar to many food franchisees across the country, the Debtors began experiencing a significant slow down in business in 2008 arising from the national financial crisis and corresponding reduction of consumer spending.  Faced with significant cash flow problems, the Debtors stopped making certain payments to their Secured Creditors.

15. In addition, despite the Debtors implementation of cost saving measures and improving their efficiencies, the Debtors were unable to meet some of their obligations under the franchise agreements with KFC Corporation ("KFC").   On or around October 20, 2009, KFC sent letters purporting to terminate their franchise agreements with the Debtors.  Subsequently, in August 2010, the Debtors negotiated a reinstatement agreement with KFC in which all of the franchise agreements were reinstated.  Pursuant to the reinstatement agreements with KFC, as of May 1, 2011, KFC may assert rights to cancel the franchise agreements with the Debtors, which will cause irreparable harm to the estates.  In an effort to preserve the going concern value of the

---

[1] All of the Debtors are majority owned by Wagstaff and his wife, with the exception of D&D Food Management Inc., D&D Idaho Food, Inc., D&D Property Investments Inc., which are each 50% owned by Donald and Frances Steinke.

Debtors' assets for all creditors and other interested parties, the Debtors commenced these Cases before the estates suffered any irreparable harm.

16.     Certain of the Debtors currently owe approximately $47.5 million to GEC, which GEC alleges is secured by substantially all of those certain Debtors' assets.  In addition, NFA, which has a claim of $13.6 million, asserts a security interest on certain of the Debtors.

17.     As a food franchisee whose value is dependent on cash flow, the Debtors must continue to operate in order to preserve the Debtors' going concern value.

18.     The Debtors have prepared 13 week budgets for each Debtor and a collateral summary (the "Budgets") that are attached as **Exhibit A** hereto.  The Budgets set forth the Debtors' anticipated cash needs through July 30, 2011.  As set forth in the Budgets, the Debtors require cash for the primary purposes of: (1) payroll, (2) supplies, (3) rent, and (4) operating expenses.  With respect to the purchase of supplies, the Debtors utilize a limited number of primary critical suppliers approved by the Debtors' franchisor.  The Debtors currently are negotiating with those suppliers to continue the existing beneficial trade terms on a going forward basis.  As reflected in the Budgets, the Debtors project that their cash balance will increase from approximately $133,000 on the Petition Date to approximately $199,000 on July 30, 2011, after the payment of a significant portion of the administrative expenses and accrued professional fees in these cases.

19.     Because projections are forward-looking, they can never be entirely accurate.  Thus, to protect the Debtors from fluctuations in expenses and costs, the Debtors request that they be permitted to have the flexibility to increase expenditures by up to 20% for any particular line item in the Budgets, and 15% in the aggregate.  Under this structure, the Debtors will have the flexibility to operate their business without disruption.

20.     The Budgets cover the period through July 30, 2011, and may be amended or modified during the interim period until a final hearing on the cash collateral motion can be held. The Debtors will attempt, prior to a final hearing on the cash collateral motion, to negotiate a consensual cash collateral agreement with some or all of their secured creditors.  If and when a consensual agreement is reached, the Debtors will file a supplement to the cash collateral motion describing the terms of the consensual agreement and requesting that the Court approve the consensual agreement at the final hearing.  If for any reason a consensual agreement is not reached before the final hearing, the Debtors will file a revised cash collateral Budget and request that the Court approve the revised Budget at the final hearing.

## **USE OF CASH**

21.     The Debtors request an expedited hearing for an interim Order authorizing the Debtors to use cash in which the Secured Creditors may claim an interest.  The Debtors assert that there is cause for ordering an expedited hearing on the Motion for the reasons set forth herein.  The Debtors will suffer irreparable harm if they cannot utilize their cash on a preliminary basis for the expenses listed in weeks 1-4 of each individual Debtor's budget, attached hereto, pending a final hearing on this Motion.

22.     Reasonable notice of the request for an expedited hearing was given by telephonic, facsimile or e-mail notice to each of the Secured Creditors, the U.S. Trustee, and the Debtors' 20 largest unsecured creditors.  The interests of a creditor wishing to object to the use of cash collateral are protected and preserved by the opportunity to object and be heard and the interim nature of the relief sought.

23.     As reflected on the individual budgets for weeks 1 through 4, the Debtors need the immediate use of cash to meet the on-going expenses of operating their businesses, including making the next payroll for employees which will occur on or after May 3, 2011 in the

approximate amount set forth in the Budget (the "Pending Payroll Obligations") and paying

payroll taxes and related employee expenses, as well as payments to trade vendors for post-

petition purchases, payment of rent, utility deposits, telephone, insurance, payments to other

parties that supply goods and services to the Debtors post-petition and other necessary expenses

associated with the administration of the bankruptcy estates.    For example, the Debtors pay

substantial amounts per week for food and other supplies and require immediate use of cash to

replenish inventory and continue ordinary course business operations.

24.    These expenses are more specifically set forth in the Debtors' cash flow

projections and Budgets for the business.    In sum, the Debtors have an immediate need to use

approximately $5 million between the Petition Date and week 4, in accordance with the attached

Budgets.    Payment of all of these amounts are necessary to avoid immediate and irreparable

harm to the Debtors' bankruptcy estates pending a hearing on the Motion and the Debtors by this

Motion seek interim and final authority herein to utilize any cash that constitutes cash collateral

for the benefit of the businesses, the bankruptcy estates and all constituents.

25.    The Debtors utilize the services of a nationally recognized payroll processing

service, Payroll People, to facilitate payroll obligations to its employees.    The Debtors are also

seeking authorization to pay prepetition portions of the Pending Payroll Obligations under a

separate motion filed contemporaneously with this Motion.

26.    The Debtors anticipate the entry of a final order authorizing the use of cash

collateral on or around June 3, 2011.    If the Debtors are unable to timely fund the Pending

Payroll Obligations, the Debtors are likely to lose their approximately 1,200 employees and be

unable to hire new employees.    In addition, the Debtors must have use of their cash to pay certain

critical vendors for goods and services necessary to operate the Restaurants.    Without the interim

use of cash as proposed in the Budgets, the Debtors will not be able to continue operations and pursue their strategies for maximizing value, and the interests of creditors and other parties in interest in these cases will be irreparably harmed.  Therefore, cause exists to reduce notice of the hearing with respect to an interim order authorizing the use of the Debtors' cash.

27.     The Debtors have cash on hand and will generate cash from continuing sales at the restaurants.  As set forth in the Budgets, the Debtors project that such cash will be sufficient to fund their chapter 11 administrative expenses, including post-petition operating expenses.

28.     As set forth in paragraph 10 above, the Debtors propose to grant Secured Creditors the Replacement Liens and will also prepare and provide to Secured Creditors copies of financial or operating reports filed with the Office of the U.S. Trustee.  The Debtors' proposed use of unencumbered cash and offer of adequate protection provides adequate protection against the risk of the Debtors' use of cash collateral and furthers the interests of all stakeholders in these bankruptcy cases.

29.     Prior to the hearing on the Motion for a final order authorizing use of cash, and in settlement of any and all matters raised in this Motion, the Debtors may enter into a stipulation or agreed order with parties claiming a security interest in cash collateral assets of the Debtors concerning the use of cash collateral, adequate protection and other related matters.  In the event that the Debtors enter into any such stipulation, they will seek approval of the stipulation without further notice or hearing pursuant to Rule 4001(d)(4) of the Federal Rules of Bankruptcy Procedure, and **DEBTORS HEREBY GIVE NOTICE OF THEIR INTENTION TO SEEK APPROVAL OF ANY SUCH STIPULATION.**

30.     Pursuant to Local Rule 9013-2(a), this Motion is accompanied by a memorandum of law proposed order and proof of service.

31.     Pursuant to Local Rule 90l3-2(e), the Debtors hereby give notice that they may, if necessary, call Kevin Burke or other members of Trinity Capital, LLC (the Debtors' proposed financial advisors), or Michael Semas (the Debtors proposed accountant), and/or other employees or advisors to the Debtors to testify about the factual matters raised in the Motion. The business address for Trinity Capital, LLC is 11755 Wilshire Blvd., Suite 2450, Los Angeles, CA 90025.  The business address for Michael Semas is 522 N. Redington Street, Hanford, CA 93230.

WHEREFORE, the Debtors move the Court for an order granting:

A.      An expedited hearing;

B.      The motion for an order authorizing the Debtors, on an interim basis, to use of unencumbered cash, or in the alternative, cash collateral through and including June 3, 2011, substantially consistent with the Budgets attached to the Motion;

C.      The request for a final order authorizing the Debtors, on a final basis, to use cash collateral under the procedures as follows: (a) through and including the period covered by the Budgets attached to the Motion; (b) through and including the term of any subsequent budget that is filed and served not less than 21 days prior to the expiration of the terms of the Budget; (c) if an objection is filed to that budget proposed in accordance with clause (b), the Debtors shall schedule a hearing on that proposed budget, in which case, the use of cash collateral shall continue for the term authorized by the Court; and (d) this process may continue through and including April 30, 2012.

D.      Such other and further relief as the Court deems just and equitable.

11

FREDRIKSON & BYRON, P.A.

Dated:  May 2, 2011

*/e/James L. Baillie*

James L. Baillie (#3980)
Cynthia A. Moyer (#211229)
Sarah M. Gibbs (#390238)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
jbaillie@fredlaw.com
cmoyer@fredlaw.com
sgibbs@fredlaw.com

PROPOSED CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

– and –

PEITZMAN, WEG & KEMPINSKY LLP

Howard J. Weg (CA State Bar No. 91057)
*hweg@pwkllp.com*
Scott F. Gautier (CA State Bar No. 211742)
*sgautier@pwkllp.com*
Thor D. McLaughlin (CA State Bar No. 257864)
*tmclaughlin@pwkllp.com*
    *Admitted pro hac vice*
2029 Century Park East, Suite 3100
Los Angeles, CA  90067
Telephone: (310) 552-3100
Facsimile:  (310) 552-3101

PROPOSED CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

4920445

## **VERIFICATION**

I, Denman Wagstaff, am the President of the Debtors.  Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in paragraphs 11-27 of the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated:  April 29, 2011

Signed: _____

Denman Wagstaff

## EXHIBIT A

**BUDGET**

| | FILING DATE 4/30/2011 | WEEK 1 ENDED 5/7/2011 | WEEK 2 ENDED 5/14/2011 | WEEK 3 ENDED 5/21/2011 | WEEK 4 ENDED 5/28/2011 | Interim Totals Week 1-4 | WEEK 5 ENDED 6/4/2011 | WEEK 6 ENDED 6/11/2011 | WEEK 7 ENDED 6/18/2011 | WEEK 8 ENDED 6/25/2011 | WEEK 9 ENDED 7/2/2011 | WEEK 10 ENDED 7/9/2011 | WEEK 11 ENDED 7/16/2011 | WEEK 12 ENDED 7/23/2011 | WEEK 13 ENDED 7/30/2011 | Final Totals Week 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | 133,935 | 133,935 | 511,859 | 1,130,451 | 605,214 | 133,935 | 779,813 | 512,048 | 1,155,535 | 868,001 | 638,152 | 250,579 | 761,805 | 354,827 | 380,968 | 133,935 |
| Cash Inflows | | 2,088,256 | 1,382,342 | 1,362,458 | 1,427,414 | 6,260,469 | 1,525,822 | 1,444,492 | 1,415,846 | 1,335,808 | 1,443,053 | 1,276,717 | 1,277,922 | 1,256,545 | 1,383,294 | 18,619,968 |
| Cash Outflows | | (1,710,331) | (763,750) | (1,887,695) | (965,565) | (5,327,341) | (1,793,587) | (801,005) | (1,703,380) | (1,270,907) | (1,830,627) | (765,491) | (1,684,901) | (935,653) | (1,564,357) | (17,677,248) |
| Restructuring fees/costs | | | | | (287,250) | (287,250) | | | | (294,750) | | | | (294,750) | | (876,750) |
| Ending Cash | 133,935 | 511,859 | 1,130,451 | 605,214 | 779,813 | 779,813 | 512,048 | 1,155,535 | 868,001 | 638,152 | 250,579 | 761,805 | 354,827 | 380,968 | 199,905 | 199,905 |

5/1/2011

Wagstaff Management, Wagstaff Minnesota, Wagstaff-Atte Alaska, Wagstaff Texas, D&D Food and D&D Idaho Food
13 Week Cash Flow Summary

| | FILING DATE 4/30/2011 | WEEK 1 ENDED 5/7/2011 | WEEK 2 ENDED 5/14/2011 | WEEK 3 ENDED 5/21/2011 | WEEK 4 ENDED 5/28/2011 | Interim Totals Week 1-4 | WEEK 5 ENDED 6/4/2011 | WEEK 6 ENDED 6/11/2011 | WEEK 7 ENDED 6/18/2011 | WEEK 8 ENDED 6/25/2011 | WEEK 9 ENDED 7/2/2011 | WEEK 10 ENDED 7/9/2011 | WEEK 11 ENDED 7/16/2011 | WEEK 12 ENDED 7/23/2011 | WEEK 13 ENDED 7/30/2011 | Final Totals Week 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Collateral Position | | | | | | | | | | | | | | | | |
| Cash, including credit card sales | 133,935 | 511,859 | 1,130,451 | 605,214 | 779,813 | 779,813 | 512,048 | 1,155,535 | 868,001 | 638,152 | 250,579 | 761,805 | 354,827 | 380,968 | 199,905 | 199,905 |
| Merchandise Inventories | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 | 666,235 |
| Secured Creditors Position | | | | | | | | | | | | | | | | |
| General Electric Credit Corp | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 | 44,471,948 |
| National Franchise Accept | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 | 13,664,302 |

Wagstaff Management, Wagstaff Minnesota, Wagstaff-Atte Alaska, Wagstaff Texas, D&D Food and D&D Idaho Food
CASH COLLATERAL POSITION

| | WEEK 1 ENDED 5/7/2011 | WEEK 2 ENDED 5/14/2011 | WEEK 3 ENDED 5/21/2011 | WEEK 4 ENDED 5/28/2011 | Interim Totals Week 1-4 | WEEK 5 ENDED 6/4/2011 | WEEK 6 ENDED 6/11/2011 | WEEK 7 ENDED 6/18/2011 | WEEK 8 ENDED 6/25/2011 | WEEK 9 ENDED 7/2/2011 | WEEK 10 ENDED 7/9/2011 | WEEK 11 ENDED 7/16/2011 | WEEK 12 ENDED 7/23/2011 | WEEK 13 ENDED 7/30/2011 | Final Totals Week 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RESTRUCTURING FEES AND COSTS** | | | | | | | | | | | | | | | |
| PWK (Debtors' counsel) | 60,000 | 50,000 | 45,000 | 45,000 | 200,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 605,000 |
| Trinity Capital (Fin. Adv.) | 9,250 | 9,250 | 9,250 | 9,250 | 37,000 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 9,250 | 120,250 |
| Adair&Evans-(Bkpg, Accounts Payable & Cash Flow Management, BK Reporting) | 9,000 | 9,000 | 9,000 | 9,000 | 36,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 117,000 |
| M. Garner (Franchise Law) | | | | 2,500 | 2,500 | | | | 2,500 | | | | 2,500 | | 7,500 |
| Kahn, Soares & Conway, LLP (Outside Corp. Counsel) | | | | 2,500 | 2,500 | | | | 2,500 | | | | 2,500 | | 7,500 |
| Creditor Comm. Counsel | | | 20,000 | 20,000 | 40,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 220,000 |
| Fredriksen & Byron, PA (Local Council) | | | | 15,000 | 15,000 | | | | 15,000 | | | | 15,000 | | 45,000 |
| Epiq-(Notice & Claims Agent) 100% | 15,000 | 7,500 | 7,500 | 7,500 | 37,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 105,000 |
| Weekly Total | 93,250 | 75,750 | 90,750 | 110,750 | 370,500 | 90,750 | 90,750 | 90,750 | 110,750 | 90,750 | 90,750 | 90,750 | 110,750 | 90,750 | **1,227,250** |
| Payment of 75% of Professional Fees | | | | (249,750) | (249,750) | | | | (264,750) | | | | (264,750) | | |
| Payment of 100% Epiq Fee | | | | (37,500) | (37,500) | | | | (30,000) | | | | (30,000) | | |
| Accrued Professional Fees | 93,250 | 169,000 | 259,750 | 83,250 | 83,250 | 174,000 | 264,750 | 355,500 | 171,500 | 262,250 | 353,000 | 443,750 | 259,750 | 350,500 | |

Wagstaff Management, Wagstaff Minnesota, Wagstaff-Atte Alaska, Wagstaff Texas, D&D Food and D&D Idaho Food
RESTRUCTURING FEES AND COSTS

| | WEEK 1 ENDED 5/7/2011 | WEEK 2 ENDED 5/14/2011 | WEEK 3 ENDED 5/21/2011 | WEEK 4 ENDED 5/28/2011 | Interim Totals Week 1-4 | WEEK 5 ENDED 6/4/2011 | WEEK 6 ENDED 6/11/2011 | WEEK 7 ENDED 6/18/2011 | WEEK 8 ENDED 6/25/2011 | WEEK 9 ENDED 7/2/2011 | WEEK 10 ENDED 7/9/2011 | WEEK 11 ENDED 7/16/2011 | WEEK 12 ENDED 7/23/2011 | WEEK 13 ENDED 7/30/2011 | Final Totals Week 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WAGSTAFF MINNESOTA** | | | | | | | | | | | | | | | |
| **Beging Cash** | 5,786 | 110,378 | 294,722 | 42,379 | 5,786 | 257,744 | 152,652 | 354,860 | 255,912 | 409,925 | 243,775 | 376,344 | 229,125 | 348,324 | 5,786 |
| **Cash Inflows** | | | | | | | | | | | | | | | |
| Sales, Estimated | 687,155 | 439,718 | 426,052 | 452,291 | 2,005,216 | 481,679 | 458,928 | 443,145 | 422,576 | 432,959 | 393,106 | 394,395 | 387,781 | 452,798 | 5,872,583 |
| Sales Tax Collected | 50,437 | 32,275 | 31,272 | 33,198 | 147,183 | 35,355 | 33,685 | 32,527 | 31,017 | 31,779 | 28,854 | 28,949 | 28,463 | 33,235 | 431,048 |
| Cash Balance | 743,378 | 582,372 | 752,046 | 527,868 | 2,158,185 | 774,779 | 645,265 | 830,532 | 709,505 | 874,662 | 665,734 | 799,687 | 645,369 | 834,358 | 6,309,417 |
| **Cash Outflows** | | | | | | | | | | | | | | | |
| Sales Tax Paid | (78,000) | (39,000) | (12,000) | - | (129,000) | (39,000) | (39,000) | (39,000) | (12,000) | (39,000) | - | (39,000) | (39,000) | (12,000) | - | (387,000) |
| Franchise Royalties | - | (5,000) | (70,599) | - | (75,599) | - | (5,000) | (81,620) | - | - | (5,000) | (77,563) | - | - | (244,782) |
| National Advertising-KFC 1% | - | (17,650) | - | - | (17,650) | - | (20,405) | - | - | - | (19,391) | - | - | - | (57,445) |
| National Advertising-KFC | - | - | - | (44,124) | (44,124) | - | - | - | (51,012) | - | - | - | (48,477) | - | (143,613) |
| National Advertising-KFC UM | - | - | - | - | - | (56,126) | - | - | - | (64,888) | - | - | - | (61,662) | (182,676) |
| NFA - Grilling Ovens | - | - | (10,568) | - | (10,568) | - | - | - | (10,568) | - | - | - | (10,568) | - | (31,704) |
| Payroll | (228,000) | - | (228,000) | - | (456,000) | (228,000) | - | (228,000) | - | (228,000) | - | (228,000) | - | (228,000) | (1,596,000) |
| Rents | (73,000) | - | - | - | (73,000) | (73,000) | - | - | - | (73,000) | - | - | - | - | (219,000) |
| McLane-Food and Supplies | (168,000) | (140,000) | (140,000) | (140,000) | (588,000) | (140,000) | (140,000) | (140,000) | (140,000) | (140,000) | (140,000) | (140,000) | (140,000) | (140,000) | (1,848,000) |
| Repairs/Maint/Supp/Util | (86,000) | (86,000) | (86,000) | (86,000) | (344,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (1,118,000) |
| Property Taxes | - | - | (162,500) | - | (162,500) | - | - | - | - | - | - | - | - | - | (162,500) |
| Ending Cash (Operations) | 110,378 | 294,722 | 42,379 | 257,744 | 257,744 | 152,652 | 354,860 | 255,912 | 409,925 | 243,775 | 376,344 | 229,125 | 348,324 | 318,696 | 318,696 |

WAGSTAFF MINNESOTA, INC.
13 WEEK CASH FLOW PROJECTION BEGINNING APRIL 29, 2011

| WAGSTAFF-ATTE ALASKA | WEEK 1 ENDED 5/7/2011 | WEEK 2 ENDED 5/14/2011 | WEEK 3 ENDED 5/21/2011 | WEEK 4 ENDED 5/28/2011 | Interim Totals Week 1-4 | WEEK 5 ENDED 6/4/2011 | WEEK 6 ENDED 6/11/2011 | WEEK 7 ENDED 6/18/2011 | WEEK 8 ENDED 6/25/2011 | WEEK 9 ENDED 7/2/2011 | WEEK 10 ENDED 7/9/2011 | WEEK 11 ENDED 7/16/2011 | WEEK 12 ENDED 7/23/2011 | WEEK 13 ENDED 7/30/2011 | Final Totals Week 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beging Cash** | **21,974** | 18,316 | 71,350 | 39,860 | 21,974 | 76,971 | 15,356 | 36,398 | 3,302 | 33,694 | (30,932) | 7,469 | (33,415) | (2,945) | 21,974 |
| **Cash Inflows** | | | | | | | | | | | | | | | |
| Sales, Estimated | 154,341 | 116,734 | 113,555 | 112,206 | 496,837 | 107,859 | 109,742 | 113,247 | 105,047 | 106,497 | 102,101 | 107,177 | 104,323 | 110,978 | 1,463,808 |
| NO SALES TAX | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Balance | 176,316 | 135,050 | 184,905 | 152,065 | 518,811 | 184,831 | 125,098 | 149,645 | 108,349 | 140,192 | 71,169 | 114,646 | 70,908 | 108,033 | 1,485,782 |
| **Cash Outflows** | | | | | | | | | | | | | | | |
| Franchise Royalties | - | (1,700) | (20,950) | - | (22,650) | - | (1,700) | (20,247) | - | - | (1,700) | (18,964) | - | - | (65,262) |
| National Advertising-KFC | - | - | - | (13,094) | (13,094) | - | - | - | (12,654) | - | - | - | (11,853) | - | (37,601) |
| National Advertising-AFA | - | - | - | - | - | (10,475) | - | - | - | (10,124) | - | - | - | (9,482) | (30,081) |
| NFA-Grilling Ovens | - | - | (2,096) | - | (2,096) | - | - | (2,096) | - | - | - | (2,096) | - | - | (6,287) |
| Payroll | (59,000) | - | (60,000) | - | (119,000) | (60,000) | - | (62,000) | - | (62,000) | - | (65,000) | - | (65,000) | (433,000) |
| Rents | (37,000) | - | - | - | (37,000) | (37,000) | - | - | - | (37,000) | - | - | - | - | (111,000) |
| Sygma-Food & Supplies | (28,000) | (28,000) | (28,000) | (28,000) | (112,000) | (28,000) | (28,000) | (28,000) | (28,000) | (28,000) | (28,000) | (28,000) | (28,000) | (28,000) | (364,000) |
| McLane-Food & Supplies | (2,000) | (2,000) | (2,000) | (2,000) | (8,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (2,000) | (26,000) |
| Repairs/Maint/Supp/Util | (32,000) | (32,000) | (32,000) | (32,000) | (128,000) | (32,000) | (32,000) | (32,000) | (32,000) | (32,000) | (32,000) | (32,000) | (32,000) | (32,000) | (416,000) |
| Property Taxes | - | - | - | - | - | - | (25,000) | - | - | - | - | - | - | - | (25,000) |
| Ending Cash | 18,316 | 71,350 | 39,860 | 76,971 | 76,971 | 15,356 | 36,398 | 3,302 | 33,694 | (30,932) | 7,469 | (33,415) | (2,945) | (28,449) | (28,449) |

WAGSTAFF-ATTE ALASKA, INC.
13 WEEK CASH FLOW PROJECTION BEGINNING APRIL 29, 2011

| WAGSTAFF MANAGEMENT | WEEK 1 ENDED 5/7/2011 | WEEK 2 ENDED 5/14/2011 | WEEK 3 ENDED 5/21/2011 | WEEK 4 ENDED 5/28/2011 | Interim Totals Week 1-4 | WEEK 5 ENDED 6/4/2011 | WEEK 6 ENDED 6/11/2011 | WEEK 7 ENDED 6/18/2011 | WEEK 8 ENDED 6/25/2011 | WEEK 9 ENDED 7/2/2011 | WEEK 10 ENDED 7/9/2011 | WEEK 11 ENDED 7/16/2011 | WEEK 12 ENDED 7/23/2011 | WEEK 13 ENDED 7/30/2011 | Final Totals Week 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginng Cash | 2,969 | 99,014 | 246,129 | 178,555 | 2,969 | 232,059 | 182,913 | 336,164 | 260,489 | 250,591 | 178,768 | 315,719 | 241,122 | 337,050 | 2,969 |
| **Cash Inflows** | | | | | | | | | | | | | | | |
| Sales, Estimated | 428,546 | 278,444 | 280,178 | 293,973 | 1,281,141 | 325,543 | 292,888 | 288,495 | 263,058 | 318,639 | 269,054 | 273,655 | 256,483 | 274,986 | 3,843,942 |
| Sales Tax Collected | 35,355 | 22,972 | 23,115 | 24,253 | 105,694 | 26,857 | 24,163 | 23,801 | 21,702 | 26,288 | 22,197 | 22,577 | 21,160 | 22,686 | 317,125 |
| Cash Balance | 466,871 | 400,429 | 549,422 | 496,781 | 1,389,804 | 584,460 | 499,964 | 648,460 | 545,250 | 595,518 | 470,019 | 611,950 | 518,764 | 634,723 | 4,164,036 |
| | | | | | | | | | | | | | | | |
| **Cash Outflows** | | | | | | | | | | | | | | | |
| Sales Tax Paid | - | - | - | (92,647) | (92,647) | - | - | - | (108,331) | - | - | - | - | - | (200,978) |
| Franchise Royalties | - | (10,300) | (44,920) | - | (55,220) | - | (10,300) | (52,524) | - | - | (10,300) | (50,828) | - | - | (179,172) |
| National Advertising-KFC | - | - | - | (28,075) | (28,075) | - | - | - | (32,828) | - | - | - | (31,767) | - | (92,670) |
| National Advertising-AFA | - | - | - | - | - | (33,690) | - | - | - | (39,393) | - | - | - | (38,121) | (111,204) |
| NFA Grilling Ovens | - | - | (5,947) | - | (5,947) | - | - | (5,947) | - | - | - | - | (5,947) | - | (17,840) |
| Payroll | (176,000) | - | (176,000) | - | (352,000) | (176,000) | - | (176,000) | - | (176,000) | - | (176,000) | - | (176,000) | (1,232,000) |
| Rents | (47,857) | - | - | - | (47,857) | (47,857) | - | - | - | (47,857) | - | - | - | - | (143,571) |
| McLane-Food & Supplies | (86,000) | (86,000) | (86,000) | (86,000) | (344,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (86,000) | (1,118,000) |
| Repairs/Maint/Supp/Util | (58,000) | (58,000) | (58,000) | (58,000) | (232,000) | (58,000) | (58,000) | (58,000) | (58,000) | (58,000) | (58,000) | (58,000) | (58,000) | (58,000) | (754,000) |
| Property Taxes | - | - | - | - | - | - | (9,500) | (9,500) | (9,500) | (9,500) | - | - | - | - | (38,000) |
| Ending Cash (Operations) | 99,014 | 246,129 | 178,555 | 232,059 | 232,059 | 182,913 | 336,164 | 260,489 | 250,591 | 178,768 | 315,719 | 241,122 | 337,050 | 276,602 | 276,602 |

WAGSTAFF MANAGEMENT CORPORATION
13 WEEK CASH FLOW PROJECTION BEGINNING APRIL 29, 2011

5/1/2011

| | WEEK 1 ENDED 5/7/2011 | WEEK 2 ENDED 5/14/2011 | WEEK 3 ENDED 5/21/2011 | WEEK 4 ENDED 5/28/2011 | Interim Totals Week 1-4 | WEEK 5 ENDED 6/4/2011 | WEEK 6 ENDED 6/11/2011 | WEEK 7 ENDED 6/18/2011 | WEEK 8 ENDED 6/25/2011 | WEEK 9 ENDED 7/2/2011 | WEEK 10 ENDED 7/9/2011 | WEEK 11 ENDED 7/16/2011 | WEEK 12 ENDED 7/23/2011 | WEEK 13 ENDED 7/30/2011 | Final Totals Week 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **D&D IDAHO FOOD** | | | | | | | | | | | | | | | |
| Begining Cash | 54,067 | 138,387 | 253,184 | 171,734 | 54,067 | 273,681 | 243,723 | 362,976 | 329,518 | 251,883 | 201,435 | 293,790 | 233,481 | 259,556 | 54,067 |
| **Cash Inflows** | | | | | | | | | | | | | | | |
| Sales, Estimated | 299,957 | 204,997 | 200,688 | 206,321 | 911,964 | 214,414 | 209,201 | 207,388 | 197,486 | 201,647 | 183,826 | 180,703 | 186,701 | 200,732 | 2,694,061 |
| Sales Tax Collected | 17,997 | 12,300 | 12,041 | 12,379 | 54,718 | 12,865 | 12,552 | 12,443 | 11,849 | 12,099 | 11,030 | 10,842 | 11,202 | 12,044 | 161,644 |
| Cash Balance | 372,022 | 355,684 | 465,914 | 390,434 | 1,020,749 | 500,960 | 465,476 | 582,807 | 538,852 | 465,629 | 396,290 | 485,335 | 431,384 | 472,332 | 2,909,772 |
| **Cash Outflows** | | | | | | | | | | | | | | | |
| Sales Tax Paid | - | - | (49,806) | - | (49,806) | - | - | - | (55,678) | - | - | - | (53,526) | - | (159,010) |
| Franchise Royalties | - | (6,500) | (33,204) | - | (39,704) | - | (6,500) | (37,119) | - | - | (6,500) | (35,684) | - | - | (125,507) |
| National Advertising-KFC | - | - | - | (20,752) | (20,752) | - | - | - | (23,199) | - | - | - | (22,302) | - | (66,254) |
| National Advertising-AFA | - | - | - | - | - | (16,602) | - | - | - | (18,559) | - | - | - | (17,842) | (53,003) |
| NFA Grilling Ovens | - | - | (5,171) | - | (5,171) | - | - | (5,171) | - | - | - | (5,171) | - | - | (15,512) |
| Payroll | (103,000) | - | (110,000) | - | (213,000) | (110,000) | - | (115,000) | - | (115,000) | - | (115,000) | - | (115,000) | (783,000) |
| Rents | (34,635) | - | - | - | (34,635) | (34,635) | - | - | - | (34,635) | - | - | - | - | (103,905) |
| Sygma-Food and Supplies | (55,500) | (55,500) | (55,500) | (55,500) | (222,000) | (55,500) | (55,500) | (55,500) | (55,500) | (55,500) | (55,500) | (55,500) | (55,500) | (55,500) | (721,500) |
| McLane-Food and Supplies | (2,500) | (2,500) | (2,500) | (2,500) | (10,000) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (32,500) |
| Repairs/Maint/Supp/Util | (38,000) | (38,000) | (38,000) | (38,000) | (152,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (38,000) | (494,000) |
| Property Taxes | - | - | - | - | - | - | - | - | (112,092) | - | - | - | - | - | (112,092) |
| Ending Cash (Operations) | 138,387 | 253,184 | 171,734 | 273,681 | 273,681 | 243,723 | 362,976 | 329,518 | 251,883 | 201,435 | 293,790 | 233,481 | 259,556 | 243,490 | 243,490 |

5/1/2011

D&D IDAHO FOOD, INC.
13 WEEK CASH FLOW PROJECTION BEGINNING APRIL 29, 2011

| | WEEK 1 ENDED 5/7/2011 | WEEK 2 ENDED 5/14/2011 | WEEK 3 ENDED 5/21/2011 | WEEK 4 ENDED 5/28/2011 | Interim Totals Week 1-4 | WEEK 5 ENDED 6/4/2011 | WEEK 6 ENDED 6/11/2011 | WEEK 7 ENDED 6/18/2011 | WEEK 8 ENDED 6/25/2011 | WEEK 9 ENDED 7/2/2011 | WEEK 10 ENDED 7/9/2011 | WEEK 11 ENDED 7/16/2011 | WEEK 12 ENDED 7/23/2011 | WEEK 13 ENDED 7/30/2011 | Final Totals Week 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **D&D FOOD** | | | | | | | | | | | | | | | |
| **Beginng Cash** | 19,535 | 93,334 | 181,126 | 141,052 | 19,535 | 162,759 | 150,313 | 261,821 | 239,472 | 213,585 | 190,609 | 279,826 | 225,501 | 286,196 | 19,535 |
| **Cash Inflows** | | | | | | | | | | | | | | | |
| Sales, Estimated | 269,412 | 173,018 | 173,662 | 183,211 | 799,302 | 212,113 | 194,926 | 194,936 | 180,030 | 206,522 | 174,334 | 168,060 | 165,198 | 174,940 | 2,470,363 |
| Sales Tax Collected | 22,226 | 14,274 | 14,327 | 15,115 | 65,942 | 17,499 | 16,081 | 16,082 | 14,853 | 17,038 | 14,383 | 13,865 | 13,629 | 14,433 | 203,805 |
| Cash Balance | 311,174 | 280,626 | 369,115 | 339,377 | 884,780 | 392,372 | 361,321 | 472,839 | 434,355 | 437,146 | 379,326 | 461,751 | 404,329 | 475,568 | 2,693,703 |
| **Cash Outflows** | | | | | | | | | | | | | | | |
| Sales Tax Paid | - | - | - | (61,102) | (61,102) | - | - | - | (103,189) | - | - | - | - | - | (164,292) |
| Franchise Royalties | - | (2,500) | (29,625) | - | (32,125) | - | (2,500) | (32,929) | - | - | (2,500) | (33,812) | - | - | (103,867) |
| National Advertising-KFC | - | - | - | (18,516) | (18,516) | - | - | - | (20,581) | - | - | - | (21,133) | - | (60,229) |
| National Advertising-AFA | - | - | - | - | - | (22,219) | - | - | - | (24,697) | - | - | - | (25,359) | (72,275) |
| NFA-Grilling Ovens | - | - | (3,438) | - | (3,438) | - | - | (3,438) | - | - | - | (3,438) | - | - | (10,313) |
| Payroll | (98,000) | - | (98,000) | - | (196,000) | (100,000) | - | (100,000) | - | (102,000) | - | (102,000) | - | (102,000) | (702,000) |
| Rents | (22,839) | - | - | - | (22,839) | (22,839) | - | - | - | (22,839) | - | - | - | - | (68,518) |
| McLane-Food & Supplies | (62,000) | (62,000) | (62,000) | (62,000) | (248,000) | (62,000) | (62,000) | (62,000) | (62,000) | (62,000) | (62,000) | (62,000) | (62,000) | (62,000) | (806,000) |
| Repairs/Maint/Supp/Util | (35,000) | (35,000) | (35,000) | (35,000) | (140,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (455,000) |
| Property Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash (Operations)** | 93,334 | 181,126 | 141,052 | 162,759 | 162,759 | 150,313 | 261,821 | 239,472 | 213,585 | 190,609 | 279,826 | 225,501 | 286,196 | 251,209 | 251,209 |

D&D FOOD MANAGEMENT
13 WEEK CASH FLOW PROJECTION BEGINNING APRIL 29, 2011

| | WEEK 1 ENDED 5/7/2011 | WEEK 2 ENDED 5/14/2011 | WEEK 3 ENDED 5/21/2011 | WEEK 4 ENDED 5/28/2011 | Interim Totals Week 1-4 | WEEK 5 ENDED 6/4/2011 | WEEK 6 ENDED 6/11/2011 | WEEK 7 ENDED 6/18/2011 | WEEK 8 ENDED 6/25/2011 | WEEK 9 ENDED 7/2/2011 | WEEK 10 ENDED 7/9/2011 | WEEK 11 ENDED 7/16/2011 | WEEK 12 ENDED 7/23/2011 | WEEK 13 ENDED 7/30/2011 | Final Totals Week 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WAGSTAFF TEXAS** | | | | | | | | | | | | | | | |
| **Beging Cash** | 29,603 | 52,431 | 83,940 | 31,634 | 29,603 | 63,848 | 54,341 | 90,566 | 66,558 | 60,474 | 48,925 | 70,657 | 41,012 | 29,537 | 29,603 |
| **Cash Inflows** | | | | | | | | | | | | | | | |
| Sales, Estimated | 113,467 | 80,932 | 80,893 | 87,268 | 362,561 | 84,653 | 85,289 | 77,397 | 81,469 | 82,757 | 71,901 | 71,779 | 75,386 | 79,871 | 1,073,062 |
| Sales Tax Collected | 9,361 | 6,677 | 6,674 | 7,200 | 29,911 | 6,984 | 7,036 | 6,385 | 6,721 | 6,827 | 5,932 | 5,922 | 6,219 | 6,589 | 88,528 |
| Cash Balance | 152,431 | 140,040 | 171,507 | 126,102 | 422,075 | 155,485 | 146,666 | 174,348 | 154,748 | 150,059 | 126,757 | 148,358 | 122,617 | 115,998 | 1,191,193 |
| **Cash Outflows** | | | | | | | | | | | | | | | |
| Sales Tax Paid | - | - | (30,539) | - | (30,539) | - | - | - | (30,504) | - | - | - | (29,588) | - | (90,631) |
| Franchise Royalties | - | (3,100) | (14,807) | - | (17,907) | - | (3,100) | (14,790) | - | - | (3,100) | (14,346) | - | - | (53,242) |
| National Advertising-KFC | - | - | - | (9,254) | (9,254) | - | - | - | (9,244) | - | - | - | (8,966) | - | (27,464) |
| National Advertising-DFW | - | - | - | - | - | (8,144) | - | - | - | (8,134) | - | - | - | (7,890) | (24,168) |
| | | | | | - | | | | | | | | | | |
| NFA Grilling Ovens | - | - | (1,527) | - | (1,527) | - | - | - | (1,527) | - | - | - | (1,527) | - | (4,580) |
| Payroll | (40,000) | - | (40,000) | - | (80,000) | (40,000) | - | (40,000) | - | (40,000) | - | (40,000) | - | (40,000) | (280,000) |
| McLane-Food & Supplies | (42,000) | (35,000) | (35,000) | (35,000) | (147,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | (462,000) |
| Repairs/Maint/Supp/Util | (18,000) | (18,000) | (18,000) | (18,000) | (72,000) | (18,000) | (18,000) | (18,000) | (18,000) | (18,000) | (18,000) | (18,000) | (18,000) | (18,000) | (234,000) |
| Ending Cash (Operations) | 52,431 | 83,940 | 31,634 | 63,848 | 63,848 | 54,341 | 90,566 | 66,558 | 60,474 | 48,925 | 70,657 | 41,012 | 29,537 | 15,108 | 15,108 |

WAGSTAFF TEXAS, INC.
13 WEEK CASH FLOW PROJECTION BEGINNING APRIL 29, 2011

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Wagstaff Minnesota, Inc.,<br>   Debtor. | Case No. 11-43073<br>Chapter 11 Case |
| Wagstaff Properties, LLC,<br>   Debtor. | Case No. 11-43074<br>Chapter 11 Case |
| Wagstaff Management Corporation,<br>   Debtor. | Case No. 11-43081<br>Chapter 11 Case |
| Wagstaff Properties Minnesota, LLC,<br>   Debtor. | Case No. 11-43076<br>Chapter 11 Case |
| D & D Food Management, Inc.,<br>   Debtor. | Case No. 11-43084<br>Chapter 11 Case |
| D & D Idaho Food, Inc.,<br>   Debtor. | Case No. 11-43083<br>Chapter 11 Case |
| D & D Property Investments, LLC,<br>   Debtor. | Case No. 11-43075<br>Chapter 11 Case |
| Wagstaff Texas, Inc.,<br>   Debtor. | Case No. 11-43080<br>Chapter 11 Case |
| Wagstaff Properties Texas, LLC,<br>   Debtor. | Case No. 11-43077<br>Chapter 11 Case |
| Wagstaff Atte Alaska, Inc.,<br>   Debtor. | Case No. 11-43082<br>Chapter 11 Case |
| Wagstaff Atte Alaska, LLC,<br>   Debtor. | Case No. 11-43078<br>Chapter 11 Case |
| A D Bakes, Inc.,<br>   Debtor. | Case No. 11-43079<br>Chapter 11 Case |

**MEMORANDUM IN SUPPORT OF MOTION FOR (I) EXPEDITED RELIEF AND (II) INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS' USE OF UNENCUMBERED CASH OR CASH COLLATERAL AND (B) GRANTING ADEQUATE PROTECTION**

## INTRODUCTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned attorneys, submit this Memorandum in support of their Motion.[1] The Debtors request an expedited hearing for an interim Order authorizing the Debtors to use cash in which General Electric Capital Franchise Finance ("GEC"), and/or Perella Weinberg Partners Asset Based Value Master Fund I L.P. and Perella Weinberg Partners ABV Opportunity Master Fund II A L.P. (serviced by NFA Funding II, LLC) (together with its affiliates, "NFA"), (NFA and GEC, the "Secured Creditors") may claim an interest, as more specifically set forth in the Motion. The Debtors are in the fast food restaurant business and the cash generated by the operation of the Debtors' businesses may or may not constitute cash collateral of the Debtors' Secured Creditors. The Debtors assert that there is cause for ordering an expedited hearing on the Motion for the reasons set forth herein and in the Motion. The Debtors will suffer irreparable harm if they cannot utilize their cash on a preliminary basis, pending a final hearing on the Motion.

The Debtors estimate that they will need to use an aggregate of approximately $5.3 million through week 4 on the Budgets, on or about June 3, 2011, in order to avoid immediate and irreparable harm to the bankruptcy estates, creditors and other parties in interest.

---

[1] Capitalized terms appearing herein that are not otherwise defined shall have the meanings ascribed to such terms in the Motion.

## **FACTUAL BACKGROUND**

The factual support for the Debtors' Motion and this Memorandum is set forth in the Motion.

## **LEGAL ANALYSIS**

## I.   **CAUSE EXISTS TO REDUCE THE NOTICE OF HEARING ON THE MOTION**

Fed. R. Bankr. P. 4001(b)(2) provides that the court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion. The Rule further provides that the court may conduct a preliminary hearing before such 14-day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Local Rule 9006-1 provides that notice of hearing must be delivered not later than seven days prior to the hearing date, except that subparagraph (e) provides that the court may reduce the notice of the hearing.  In these cases, there are grounds to reduce the notice of the interim hearing and authorize use of unencumbered cash, or in the alternative, cash collateral on a preliminary basis pending the final hearing.  The Debtors have an urgent need for use of their unencumbered cash or cash collateral in order to avoid irreparable harm.  The Debtors must meet payroll, rents, post-petition trade vendor and other obligations necessary to operate their businesses substantially in accordance with the Budgets in order to preserve and maximize value. Unless the Debtors are able to do so, the value of the bankruptcy estates will be greatly diminished.  Finally, the notice of this Motion is more than 36 hours prior to hearing and is consistent with the expedited relief contemplated in the local instructions.

II.    **THE COURT SHOULD AUTHORIZE DEBTORS' PROPOSED USE OF UNENCUMBERED CASH AND CASH COLLATERAL ON AN INTERIM AND FINAL BASIS SUBSTANTIALLY IN ACCORDANCE WITH THE BUDGET**

A.    **The Debtors Should Be Authorized to Use Their Cash Pursuant to 11 U.S.C. §§ 361 and 363**

In United Savings v. Timbers of Inwood Forest, 484 U.S. 365, 108 S.Ct. 626 (1988), the United States Supreme Court analyzed and quantified the parameters of the "interest in property," referenced in sections 361, 362(d)(1), and 363, which the Bankruptcy Code undertakes to protect, where required, through adequate protection.  This analysis led the Supreme Court in Timbers to the conclusion that the "interest in property" referenced in the above sections of the Bankruptcy Code means, and is limited to, the "value of the Collateral." Timbers, 108 S.Ct. at 630.  Therefore, under the Timbers analysis, the adequate protection provisions in the Bankruptcy Code protect a secured creditor only from a potential diminution in the value of that creditor's collateral during the post-petition period.  Id.

Section 361 of the Bankruptcy Code provides that periodic cash payments, replacement liens, or relief constituting the "indubitable equivalent" of the creditor's interest may provide adequate protection.  See 11 U.S.C. § 361.  In addition, section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may engage in transactions, including the use of unencumbered cash, in the ordinary course of its business, and may use cash collateral only with the secured creditor's consent or if the Court, after notice and a hearing, authorizes such use.  See 11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides that the Court must provide the secured creditor with adequate protection of its interest upon request of the creditor. The Eighth Circuit Court of Appeals has reasoned that:

> In any given case, the Bankruptcy Court must necessarily
> (1) establish the value of the secured creditor's interest, (2) identify
> the risk to the secured creditor's value resulting from the debtor's
> request for use of cash collateral, and (3) determine whether the

> debtor's adequate protection proposal protects values as nearly as
> possible against risk to that value consistent with the concept of
> indubitable equivalence.

In re Martin, 761 F.2d 472, 476-77 (8th Cir. 1985).

The "value" oriented adequate protection analysis adopted by the Supreme Court in the

Timbers case has been closely adhered to by the courts which have subsequently had occasion to

address this issue.   See e.g., In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass.

1990) (so long as the receivables being collected and used by the debtor are being replaced by

sufficient new receivables in which the creditor is granted a security interest, the creditor is

adequately protected); In re Johnson, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (secured creditor

is not impaired and is not entitled to receive adequate protection payments where value of

collateral does not decline); In re Century Inv. Fund, VII Ltd. Partnership, 96 B.R. 884, 887

(Bankr. E.D. Wis. 1989) (where value of collateral appears to be stable, secured creditor is not

entitled to adequate protection payments); In re Anderson, 86 B.R. 877, 889 (Bankr. N.D. Ind.

1988) (secured creditor was required to show a necessity for adequate protection by

demonstrating a decline in asset value from the petition date); In re Kessler, 86 B.R. 134, 136

(Bankr. C.D. Ill. 1988) (under Timbers, movants are not entitled to adequate protection

payments, as there was no showing that property was depreciating in value).

Other courts have found that adequate protection is not necessary where the collateral is

not depreciating in value.   In re Elmore, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988), the

Honorable Samuel Bufford held that:

> [T]he Court finds that the property is not depreciating in value.  In
> consequence, the Court finds that Lomas [Secured Creditor] is
> adequately protected by the value of its collateral....  The right to
> receive payments is a simple contract right, that supports only a
> claim in the bankruptcy case.   There is no other adequate
> protection to which Lomas is entitled under the Bankruptcy Code.

Elmore, supra, 94 B.R. at 677 (citation omitted).   Similarly, in In re McCombs, the Honorable

John E. Ryan held that:

> The analysis of the Supreme Court in Timbers is instructive here.
> The phrase "interest in property" in § 363(e) means the value of
> the collateral.  That is the interest that I am required to protect.  If
> that value is likely to diminish during the time of the use, adequate
> protection must be provided by the Debtor.

McCombs, supra, 88 B.R. at 266 (emphasis added).

Under the strict value-oriented analysis adopted by the Supreme Court in Timbers (and

adhered to by the cases cited above), the adequate protection inquiry under section 363(e) of the

Bankruptcy Code is limited to determining whether the debtor's use of a secured creditor's

collateral will reduce the value of the creditor's collateral base.  If the debtor can establish that

the proposed use of the collateral will not cause a decline in the value of the collateral, then court

authorization of such use is appropriate.  Not infrequently, a secured creditor will contend that it

somehow has a right to be paid adequate protection payments, post-petition, even where no

decline in the value of the collateral is either occurring or anticipated.  The Supreme Court in

Timbers expressly rejected this very contention stating:

> It is obvious (since §§ 361 and 362(d) (1) do not entitle the secured
> creditor to immediate payment of the principal of his collateral)
> that this "realization" is to "result" not at once, but only upon
> completion of the reorganization. It is then that he must be assured
> "realization ... of the indubitable equivalent" of his collateral.

Timbers, 108 S.Ct. at 633.

Here, as set forth below, the Debtors assert that neither the cash currently in the

possession of any of the Debtors nor any cash generated from post-Petition Date sales at the

restaurants constitute cash collateral but, rather, represents unencumbered cash proceeds

available for use by the Debtors.  Although the Debtors believe that the Secured Creditors do not

have an interest in the Debtors' cash, the Debtors are prepared to provide adequate protection to

the Secured Creditors that do claim a security interest in the proceeds from the sale of inventory.

Such adequate protection would cover the Debtors' use of those assets in which Secured

Creditors is claiming an interest — including machinery, equipment, and inventory — as well as

the Debtors' use of cash to the extent such cash is determined to be Secured Creditors' cash

collateral.

Under the Debtors' adequate protection proposal, as set forth in paragraph 10 of the

Motion, Secured Creditors' interests in any of its collateral will be adequately protected from a

diminution in value through the Replacement Liens granted to Secured Creditors, through the

receipt of timely financial information, and through the maintenance and preservation of the

Debtors' businesses and going concern value.  Any Replacement Lien would exclude any causes

of action under chapter 5 of the Bankruptcy Code or the proceeds thereof, and would be

enforceable in an amount equal to the aggregate post-Petition Date diminution in the value of

Secured Creditors' interest in its collateral.

In summary, the adequate protection proposed by the Debtors — a combination of the

Replacement Liens, regular reporting, and preservation of the Debtors' going concern value —

when taken together adequately protect the Secured Creditors for the use of their collateral.

Even if the Court were to determine that Secured Creditors do have an interest in the Debtors'

cash, permitting the Debtors to utilize cash would be justified in light of the proposed adequate

protection, particularly when coupled with the benefits to the Debtors' restructuring efforts as a

result of such use.  Thus, the adequate protection proposal offered by the Debtors provides

reasonable and adequate protection for the claimed interests of the Secured Creditors.  See

Martin, 761 F.2d at 476-77.

**B.    The Secured Creditors Do Not Have a Perfected Security Interest in the Debtors' Prepetition Cash Held in Accounts at Third-Party Banks**

All of the Debtors operating accounts and deposit accounts are located and maintained at banks other than Secured Creditors. After a review of the Secured Creditors' respective loan documents and contracts, it does not appear that any of the Secured Creditors hold an account control agreement over such accounts. Consequently, none of the Secured Creditors hold a perfected security interest or lien on the Debtors' prepetition cash. See Uniform Commercial Code ("UCC") § 9-312(a) (a security interest in a deposit account may be perfected only by control under Section 9-314); UCC § 9-313(c) (a secured party takes possession of collateral in the possession of a third party when the person in possession authenticates a record acknowledging that it holds possession of the collateral for the secured party's benefit); UCC § 9-315(c) (providing that a security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected).

**C.    The Secured Creditors Do Not Have an Interest in Revenues Generated from the Debtors' Postpetition Services**

A restaurant generates revenue from two primary sources, the delivery of goods and the delivery of services. The Secured Creditors may have a lien on certain food products, equipment and/or other assets held by the Debtors as of the Petition Date, and these liens may extend to the "proceeds" of such collateral post-petition. Notwithstanding the foregoing, these liens do not and will not extend to the cash generated from the "services" component of the Debtors' businesses. See 11 U.S.C. § 552(b).[2] The cash generated from the provision of services is "after

---

[2] Section 552(b) of the Bankruptcy Code states as follows:

Except as provided in sections 363, 506(c), 522, 544, 544, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts or other payments for the use occupancy of rooms and other public facilities in hotels, motels, or other lodging

acquired property" and remains free and clear of the alleged liens of the Secured Creditors in the

Debtors' cash.   In re Skagit Pacific Corporation, 316 B.R. 330 (9th Cir. BAP 2004)

("Furthermore, revenue generated by the operation of a debtor's business, post-petition, is not

considered proceeds if such revenue represents compensation for goods and services rendered by

the debtor in its everyday business performance).   See also In re Texas Tri-Collar, Inc., 29 B.R.

724 (Bankr.W.D.La. 1983) (pursuant to Section 552, a creditor's pre-petition blanket lien does

not extend to post-petition receivables).

In addition to the foregoing, cash generated from restaurant operations does not constitute

cash collateral.   See In re Inman, 95 B.R. 479, 480-81 (Bankr. W.D. Ky. 1988) (court held that

revenues generated from the operation of a debtor's fast-food restaurants were not proceeds from

the sale of inventory that was subject to a creditor's security interest); In re Cafeteria Operators,

L.P., 299 B.R. 400 (Bankr. N.D. Tex. 2003) (court held that revenue generated by debtor's labor,

in preparing food for human consumption, was not necessarily subject to a prepetition security

interest in raw food inventory); U.S. Trust Nat. Assoc v. Venice MD LLC, 92 Fed. Appx. 948,

953 (4th Cir. 2004) (court held that revenue generated by sale of food in restaurant is not

considered proceeds because restaurant establishments are service-oriented businesses); In re

Mid-City Hotel Assocs., 114 B.R. 634, 642-43 (Bankr. D. Minn. 1990) (court held that restaurant

income is not proceeds of the real property upon which the restaurant is located); In re Zeeway

Corp, 71 B.R. 210, 211 (9th Cir. BAP 1987) (court held that income is not proceeds of real

property but the result of services provided by the business); Everett Home Town Limited

---

properties, then such security interest extends to such rents and such fees, charges, accounts or other payments
acquired by the estate after the commencement of the case to the extent provided in such security agreement, except
to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b).

P'ship, 146 B.R. 453, 456 (Bankr. D. Ariz. 1992) (court held that restaurant revenue cannot be

considered proceeds because such revenue is the result of services provided by the business); In

re GGVXX, Ltd., 130 B.R. 322 (Bankr. D. Colo., 1991); In re McCann, 140 B.R. 926 (Bankr. D.

Mass. 1992) (cash obtained from operation of a restaurant are not proceeds from the sale or

disposition of inventory (e.g., food products), but rather proceeds from the provision of services);

In re Corner Pockets of the Southwest, Inc., 85 B.R. 559, 563 (Bankr. D. Mont. 1988) (court held

that restaurant revenues result form services and are not proceeds of real property upon which

restaurant is located).

        In the Inman case, the Bankruptcy Court for the Western District of Kentucky noted that

the restaurant industry, in general, is a service-oriented industry.   In comparison with food

wholesalers and retailers who sell food products in their natural or packaged state, restaurants

expend a great deal of time and energy preparing individual food orders by transforming these

natural or packaged foods into menu items.   The Inman court also remarked that, as in any

business, the cost of preparing such foods for human consumption is without a doubt passed on

to the consumer.   Id.   The court found that revenues generated by a fast food restaurant did not

constitute proceeds from the sale of inventory.   Id. at 481.   The court held that the secured lender

did not have a valid, perfected security interest in the resulting cash deposits and concluded that

the debtor's postpetition cash was free of the prepetition interests of the secured lender.   The

court in Cafeteria Operators reached a similar conclusion, holding that, at most, a portion of the

cash received by a restaurant from its patrons constituted proceeds from the sale of inventory; the

bulk of the proceeds represented payment for services.   Cafeteria Operators, 299 B.R. 409.   As a

result, the Debtors' position that the Secured Creditors do not have an interest in the Debtors'

cash is amply supported by the Bankruptcy Code and relevant case law.

## <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should enter an order authorizing the Debtors to use cash collateral on a interim basis, and thereafter a final order authorizing use of cash collateral under the procedures as follows: (a) through and including the period covered by the Budgets attached to the Motion; (b) through and including the term of any subsequent budget that is filed and served not less than 21 days prior to the expiration of the terms of the Budget; (c) if an objection is filed to that budget proposed in accordance with clause (b), the Debtors shall schedule a hearing on that proposed budget, in which case, the use of cash collateral shall continue for the term authorized by the Court; and (d) this process may continue through and including April 30, 2012.  In addition, the Court should grant such further and additional relief as requested in the Motion.

FREDRIKSON & BYRON, P.A.

Dated:  May 2, 2011

*/e/James L. Baillie* _____
James L. Baillie (#3980)
Cynthia A. Moyer (#211229)
Sarah M. Gibbs (#390238)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
jbaillie@fredlaw.com
cmoyer@fredlaw.com
sgibbs@fredlaw.com

PROPOSED CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

11

– and –

PEITZMAN, WEG & KEMPINSKY LLP

Howard J. Weg (CA State Bar No. 91057)
*hweg@pwkllp.com*
Scott F. Gautier (CA State Bar No. 211742)
*sgautier@pwkllp.com*
Thor D. McLaughlin (CA State Bar No. 257864)
*tmclaughlin@pwkllp.com*
    *Admitted p ro hac vice*
2029 Century Park East, Suite 3100
Los Angeles, CA  90067
Telephone: (310) 552-3100
Facsimile:  (310) 552-3101

PROPOSED CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Wagstaff Minnesota, Inc., | Case No. 11-43073 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Properties, LLC, | Case No. 11-43074 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Management Corporation, | Case No. 11-43081 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Properties Minnesota, LLC, | Case No. 11-43076 |
| Debtor. | Chapter 11 Case |
| | |
| D & D Food Management, Inc., | Case No. 11-43084 |
| Debtor. | Chapter 11 Case |
| | |
| D & D Idaho Food, Inc., | Case No. 11-43083 |
| Debtor. | Chapter 11 Case |
| | |
| D & D Property Investments, LLC, | Case No. 11-43075 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Texas, Inc., | Case No. 11-43080 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Properties Texas, LLC, | Case No. 11-43077 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Atte Alaska, Inc., | Case No. 11-43082 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Atte Alaska, LLC, | Case No. 11-43078 |
| Debtor. | Chapter 11 Case |
| | |
| A D Bakes, Inc., | Case No. 11-43079 |
| Debtor. | Chapter 11 Case |

## FINAL ORDER (A) AUTHORIZING USE OF UNENCUMBERED CASH AND CASH COLLATERAL AND (B) GRANTING ADEQUATE PROTECTION

This case came before the court on the Debtors' Motion for (I) Expedited Relief, and (II) Interim and Final Orders (A) Authorizing Debtors' Use of Unencumbered Cash and Cash Collateral and (B) Granting Adequate Protection (the "Motion").  Capitalized terms used, but not otherwise defined herein, shall have the meanings given to them in the Motion.  Appearances are noted on the record.

Based on the arguments of counsel and the documents of records herein, the Court being fully advised in the premises, and the Court's findings of fact and conclusions of law having been stated on the record at the close of argument,

**THE COURT FINDS AND CONCLUDES THAT:**

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and reference from the District Court for the District of Minnesota pursuant to 28 U.S.C. § 157. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Notice of the Motion was appropriate and sufficient under the circumstances and constitutes due and sufficient notice thereof.

C.      Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors have retained possession of their assets and are authorized to continue the operations and management of their businesses as debtors in possession.

D.      No official committee of unsecured creditors has been appointed in the chapter 11 cases and no request has been made for appointment of a trustee or examiner.

E.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.

F.      The Debtors' use of cash and other assets is necessary to the continued viability of the Debtors' businesses.

G.      The Debtors assert that General Electric Capital Franchise Finance ("GEC") and/or Perella Weinberg Partners Asset Based Value Master Fund I L.P. and Perella Weinberg Partners ABV Opportunity Master Fund II A L.P. (serviced by NFA Funding II, LLC) (together with its affiliates, "NFA"), (NFA and GEC, the "Secured Creditors") may have a lien on or security interests in certain non-cash assets of the Debtors, but have no interest in, or lien on, the Debtors' cash.  The Secured Creditors assert that the Debtors' cash may be Cash Collateral, the use of which requires their consent or an order of the Court.  The Court makes no finding on the issue.  Rather, to the extent the Debtors' cash is Cash Collateral, the Debtors' use of such cash is, as set forth below, authorized and approved.

H.      As of the Petition Date according to the books and records of the Debtors the outstanding obligations to Secured Creditors are approximately $47.5 million to GEC and $13.6 million to NFA.

I.      The Debtors have proposed to provide adequate protection to Secured Creditors for the use of (i) those assets of the Debtors that are collateral of Secured Creditors, and (ii) cash, but only if, and to the extent, the Court later determines that the Debtors' cash is cash collateral of Secured Creditors.  The Court makes no determination as to the priority, validity or extent of any lien asserted by the Secured Creditors, or the right of the Secured Creditors to adequate protection.

J.     The evidence presented at or before the hearing substantiates the Debtors' request

for use of cash and other assets.

**IT IS HEREBY ORDERED THAT:**

1     Subject to the terms of this Final Order, the Debtors shall be, and hereby are,

authorized to use the cash generated by the operation of their businesses to continue to operate

their businesses, on a final basis, under the procedures as follows: (a) through and including the

period covered by the Budgets attached to the Motion; (b) through and including the term of any

subsequent budget that is filed and served not less than 21 days prior to the expiration of the

terms of the Budget; (c) if an objection is filed to that budget proposed in accordance with clause

(b), the Debtors shall schedule a hearing on that proposed budget, in which case, the use of cash

collateral shall continue for the term authorized by the Court; and (d) this process may continue

through and including April 30, 2012.

2     Such authorization shall include, but not be limited to, authorization (a) to pay the

Debtors' normal and customary operating expenses, approved chapter 11 expenses, and

approved prepetition and postpetition administrative claims; (b) to pay the fees of the United

States Trustee pursuant to 28 U.S.C. § 1930; (c) to the extent separately ordered by the Court, to

pay the fees and costs of the professionals retained pursuant to Court order; and (d) to make

those payments they are authorized to make pursuant to orders of the Court.  The Debtors are

authorized to make the expenditures provided for in the Budget monthly, and if necessary, to

exceed the amounts set forth in each respective Budget by up to 20% for any particular line item

in the Budget and as much as 15% of the total Budget.

3     Subject to sections 361 and 363 of the Bankruptcy Code, as adequate protection

for any diminution in the Secured Creditors collateral arising from the Debtors use, the Debtors

4

propose to: (a) replacement liens, pursuant to 11 U.S.C. § 552, in the Debtors' postpetition assets of the same type and nature as those assets, subject to the prepetition liens of Secured Creditors (collectively, the "Replacement Liens"); provided, however, that any and all such Replacement Liens will be of the same nature, character, validity, priority, dignity, extent and effect as Secured Creditors had, if any, in such collateral prior to the Petition Date and shall be without prejudice to the rights of the Debtors or any other party in interest to challenge the nature, character, validity, priority, dignity, extent and effect of any such liens or commence any proceeding under the Bankruptcy Code seeking a determination with respect thereto or seeking to avoid or set aside any such liens; and provided further that such Replacement Liens shall specifically exclude all actions under chapter 5 of the Bankruptcy Code and the proceeds thereof; and (b) the right to receive copies of regular financial or operating reports, including those filed with the Office of the U.S. Trustee.

4    Nothing in this Final Order shall operate to waive any of the Debtors' rights to contest the rights of the Secured Creditors to receive adequate protection.

5    Any Replacement Liens granted or cash to be paid to Secured Creditors shall be limited to actual and demonstrated diminution in the value of Secured Creditors' collateral.

6    Subject to the other provisions of this Final Order, the Replacement Liens granted herein shall be valid and fully perfected without any further action by the Debtors or Secured Creditors and without the execution or the recordation of any financing statements, security agreements, mortgages or other documents.  Notwithstanding the foregoing, Secured Creditors are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, account control agreements, notices of lien or similar instruments

in any jurisdiction or take any other action in order to validate and perfect the Replacement Liens granted to them hereunder.

7       The Replacement Liens granted hereunder shall be subject to the allowed postpetition fees and expenses of professionals retained in the Debtors' chapter 11 cases and the fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930.

8       The provisions of this Final Order, as well as the Replacement Liens and security interests granted herein, shall continue in this and any subsequent case under the Bankruptcy Code.  The Replacement Liens and security interests shall maintain their priority as provided in this Final Order, until the indebtedness of the Debtors to Secured Creditors has been completely paid and satisfied, unless otherwise ordered by the Court.

9       This Final Order is without prejudice to the rights of the parties to seek any further or different relief, or modification of this Final Order, including, but not limited to, relief from the automatic stay.

10      Except as expressly provided herein, the rights, claims, and interests of the Debtors, Secured Creditors, and all other parties in interest are hereby reserved.

11      The Court has and will retain jurisdiction to enforce this Order according to its terms, upon motion by any party.

Dated:                                  _____

                                        Nancy C. Dreher
                                        United States Bankruptcy Judge

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Wagstaff Minnesota, Inc., | Case No. 11-43073 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Properties, LLC, | Case No. 11-43074 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Management Corporation, | Case No. 11-43081 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Properties Minnesota, LLC, | Case No. 11-43076 |
| Debtor. | Chapter 11 Case |
| | |
| D & D Food Management, Inc., | Case No. 11-43084 |
| Debtor. | Chapter 11 Case |
| | |
| D & D Idaho Food, Inc., | Case No. 11-43083 |
| Debtor. | Chapter 11 Case |
| | |
| D & D Property Investments, LLC, | Case No. 11-43075 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Texas, Inc., | Case No. 11-43080 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Properties Texas, LLC, | Case No. 11-43077 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Atte Alaska, Inc., | Case No. 11-43082 |
| Debtor. | Chapter 11 Case |
| | |
| Wagstaff Atte Alaska, LLC, | Case No. 11-43078 |
| Debtor. | Chapter 11 Case |
| | |
| A D Bakes, Inc., | Case No. 11-43079 |
| Debtor. | Chapter 11 Case |

**INTERIM ORDER GRANTING EXPEDITED RELIEF AND (A) AUTHORIZING USE
OF UNENCUMBERED CASH AND CASH COLLATERAL AND (B) GRANTING
ADEQUATE PROTECTION**

This case came before the court on the debtors' Motion for (I) Expedited Relief, and
(II) Interim and Final Orders (A) Authorizing Debtors' Use of Unencumbered Cash and Cash
Collateral and (B) Granting Adequate Protection (the "Motion"). Capitalized terms used, but not
otherwise defined herein, have the meanings given to them in the Motion. Appearances are
noted on the record.

Based on the arguments of counsel and the documents of records herein, the court being
fully advised in the premises, and after due deliberation and consideration and sufficient cause
appearing therefor,

**THE COURT FINDS AND CONCLUDES THAT:**

A.      The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and
reference from the District Court for the District of Minnesota pursuant to 28 U.S.C. § 157.
Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Notice of the Motion and the Interim Hearing was appropriate and sufficient
under the circumstances and constitutes due and sufficient notice thereof.

C.      Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the debtors have
retained possession of their assets and are authorized to continue the operations and management
of their businesses as debtors in possession.

D.      No official committee of unsecured creditors has been appointed in the chapter 11
cases and no request has been made for appointment of a trustee or examiner.

2

E.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.

F.      The debtors' use of cash and other assets is necessary to the continued viability of the debtors' businesses.

G.      The debtors assert that General Electric Capital Franchise Finance ("GEC") and/or Perella Weinberg Partners Asset Based Value Master Fund I L.P. and Perella Weinberg Partners ABV Opportunity Master Fund II A L.P. (serviced by NFA Funding II, LLC) (together with its affiliates, "NFA"), (NFA and GEC, the "Secured Creditors"), may have a lien on or security interests in certain non-cash assets of the debtors, but have no interest in, or lien on, the debtors' cash.  The Secured Creditors assert that the debtors' cash may be Cash Collateral, the use of which requires its consent or an order of the court.  The court makes no finding on the issue for purposes of this Interim Order.  Rather, to the extent the debtors' cash is Cash Collateral, the debtors' use of such cash is, as set forth below, authorized and approved on an interim basis.

H.      As of the Petition Date, 2011, according to the books and records of the debtors the outstanding obligations to the Secured Creditors are approximately $47.5 million to GEC and $13.6 million to NFA.

I.      The debtors have proposed to provide adequate protection to Secured Creditors for the use of (i) those assets of the debtors that are collateral of Secured Creditors, and (ii) cash, but only if, and to the extent, the court later determines that the debtors' cash is cash collateral of the Secured Creditors.  The court makes no determination as to the priority, validity or extent of any lien asserted by the Secured Creditors, or the right of the Secured Creditors to adequate protection.

J.      The evidence presented at or before the hearing substantiates the debtors' request for use of cash and other assets.

**IT IS HEREBY ORDERED THAT:**

1.      The debtors' Motion for expedited hearing is granted.  Notice of the Motion was appropriate under the circumstances.

2.      Subject to the terms of this Interim Order, the debtors shall be, and hereby are, authorized to use the cash generated by the operation of their businesses to continue to operate their businesses in the ordinary course of business through week 4 of the budgets, on or about June 3, 2011, consistent with the Budgets attached hereto as <u>Exhibit 1</u>.  Such authorization shall include, but not be limited to, authorization (a) to pay the debtors' operating expenses required to avoid immediate and irreparable harm; and (b) to make those payments that are authorized pursuant to orders of the Court.  The debtors are authorized to make the expenditures provided for in the Budgets monthly, and if necessary, to exceed the amounts set forth in each respective Budget by as much as 20% for any line item and 15% of the total Budget.

3.      Subject to sections 361 and 363 of the Bankruptcy Code, as adequate protection for any diminution in the Secured Creditors collateral arising from the debtors' use, the Secured Creditors are granted: (a) replacement liens, pursuant to 11 U.S.C. § 552, in the Debtors' postpetition assets of the same type and nature as those assets subject to the prepetition liens of Secured Creditors, if any (collectively, the "Replacement Liens"); <u>provided,</u> <u>however,</u> that any and all such Replacement Liens will be of the same nature, character, validity, priority, dignity, extent and effect as the Secured Creditors had, if any, in such collateral prior to the Petition Date and shall be without prejudice to the rights of the debtors or any other party in interest to challenge the nature, character, validity, priority, dignity, extent and effect of any such liens or

4

commence any proceeding under the Bankruptcy Code seeking a determination with respect thereto or seeking to avoid or set aside any such liens; and provided further that such Replacement Liens shall specifically exclude all actions under chapter 5 of the Bankruptcy Code and the proceeds thereof; and (b) the right to receive copies of regular financial or operating reports, including those filed with the Office of the U.S. Trustee.

4.      Nothing in this Interim Order shall operate to waive any of the debtors' rights to contest the rights of the Secured Creditors to receive adequate protection.

5.      Any Replacement Liens granted or cash to be paid to Secured Creditors shall be limited to actual and demonstrated diminution in the value of the Secured Creditors' collateral.

6.      Subject to the other provisions of this Interim Order, the Replacement Liens granted herein shall be valid and fully perfected without any further action by the debtors or the Secured Creditors and without the execution or the recordation of any financing statements, security agreements, mortgages or other documents.  Notwithstanding the foregoing, the Secured Creditors are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, account control agreements, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the Replacement Liens granted to them hereunder.

7.      For purposes of this Interim Order only, the Replacement Liens granted hereunder shall be subject to the allowed postpetition fees and expenses of professionals retained in the Debtors' chapter 11 cases and the fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930.

8.      The provisions of this Interim Order, as well as the Replacement Liens and security interests granted herein, shall continue in this and any subsequent case under the

Bankruptcy Code.  The Replacement Liens and security interests shall maintain their priority as provided in this Interim Order, until the indebtedness of the debtors to the Secured Creditors has been completely paid and satisfied, unless otherwise ordered by the Court.

9.      This Interim Order is without prejudice to the rights of the parties to seek any further or different relief, or modification of this Interim Order, including, but not limited to, relief from the automatic stay.

10.     Except as expressly provided herein, the rights, claims, and interests of the debtors, the Secured Creditors, and all other parties in interest are hereby reserved.

11.     The Final Hearing is scheduled for May 18, 2011, at 10:30 a.m. before the Honorable Nancy C. Dreher, Courtroom 7 West, United Stated Courthouse, 300 South Fourth Street, Minneapolis, Minnesota.

12.     The court has and will retain jurisdiction to enforce this Order according to its terms upon motion by any party.

Dated:                                      _____

Robert J. Kressel
United States Bankruptcy Judge